COMMONWEALTH vs. KEITH MEZZANOTTI.

No. 88-P-439.

Worcester. October 7, 1988. — November 7, 1988.

Present: GREANEY, C.J., PERRETTA, & WARNER, JJ.

*Burning a Dwelling House. Identification. Evidence*, Competency, Identification. *Malice. Joint Enterprise. Practice, Criminal*, Instructions to jury. *Constitutional Law*, Confrontation of witness.

At the trial of an indictment for burning a dwelling house (arson) the evidence, circumstantial and inferential, was sufficient to warrant the jury's verdict of guilty beyond a reasonable doubt on a theory that the defendant either committed the arson or assisted in its commission as a joint venturer. [525-527]

At the trial of an arson indictment, evidence that two witnesses recognized the defendant's voice at the scene of the crime was properly admitted for the jury's consideration. [527-528]

At a criminal trial, error, if any, in the judge's instructions on malice as an element of the crime of arson, presented no substantial risk of a miscarriage of justice, where malice was not a contested issue at trial. [528-529]

At a criminal trial, no constitutional right of confrontation was abridged by the judge's denial of a defendant's request, made after he had rested his case, that he be allowed to cross-examine his codefendant on unspecified matters, where the defendant had acquiesced in the judge's limiting instructions to the jury that they were not to consider the codefendant's testimony in their deliberation as to the defendant's guilt. [530-531]

INDICTMENT found and returned in the Superior Court Department on September 12, 1986.

The case was tried before *William C. O'Neil, Jr.*, J.

*Brownlow M. Speer*, Committee for Public Counsel Services, for the defendant.

*Lynn Morrill Turcotte*, Assistant District Attorney, for the Commonwealth.

GREANEY, C.J. A jury in the Superior Court convicted the defendant of burning of a dwelling house (arson). G. L. c. 266,

§ 1. Represented by new counsel on appeal, the defendant argues that (1) his motion for a required finding of not guilty should have been allowed, (2) the judge's instructions to the jury on malice and joint venture created a substantial risk of a miscarriage of justice, and (3) the denial of his counsel's request to cross-examine Esther Ortiz, the codefendant, who was also convicted of arson, considered together with part of the prosecutor's closing argument, abridged his constitutional right to confrontation. We affirm the conviction.

The evidence in the Commonwealth's case may be summarized as follows.

(a) On June 18, 1986, at 10:02 P.M., fire fighters and police responded to a radio call reporting a fire at 92 Chatham Street in Worcester. Unable to enter the front first floor apartment (the building is a six-family, three story apartment house with three units in the front and three in the back), the fire fighters proceeded to the back first floor apartment and broke in. After entering, the fire fighters heard a hissing sound and smelled a strong odor of natural gas. Upon investigation, the four burners on the gas kitchen stove as well as the gas oven were found to be turned on. One of the burners' jets was lit. All the windows in the apartment had been closed. A fire was discovered burning on the upper shelf of a bedroom closet. Before being extinguished, the fire had consumed portions of papers, books, and newspapers which had been left or placed on the shelf. Part of the closet had been charred. The fire had burned for approximately twenty minutes. Had the gas vapors reached the open flame in the closet an explosion would have resulted.

(b) The tenants of this first floor apartment were the codefendant, Esther Ortiz, her husband, and their three children. The second floor tenants directly above the Ortiz family were Peter and Cindy Lamb, who also had three young children. The Lambs had moved into the building three months before the fire. At first, the Lambs had been on friendly terms with the Ortizes. About two weeks after moving in, Esther Ortiz told the Lambs that she was having problems with the landlord and that he had obtained an execution for possession of her apartment for nonpayment of rent. Esther Ortiz also told the

Lambs that she was going to flood the building or burn the place down if the landlord pursued her eviction. She repeated these threats on several occasions. The Ortizes had been ordered to vacate their apartment by June 19, 1986.

(c) About two weeks before the fire cordial relations between the Lambs and the Ortizes had ended. The falling out occurred after the Lambs turned off the power they had been supplying to the Ortizes by means of an extension cord between the two apartments. Esther Ortiz responded by smashing the glass in the door to the stairway leading to the Lambs' apartment with a club. The Ortizes banged on the building pipes and yelled through the ceiling between the two apartments that the Lambs were all dead. Problems between the Lambs and Ortiz family continued until the fire occurred.

(d) On June 18, 1986, the day of the fire (and the day before the Ortizes were to be evicted), the defendant, along with Esther Ortiz, loaded household items into a station wagon. Around 9:45 that night, the defendant was seen by Peter Lamb in front of the apartment house, getting out of the station wagon and entering the building. According to Lamb, Esther Ortiz remained in the station wagon along with another individual who was unidentified.

(e) After seeing the defendant enter the building, Peter Lamb took a bath. While bathing he thought he smelled smoke. He checked his apartment but found nothing. He sat down to watch the lottery drawing on television at 9:55 P.M. After the drawing, Peter Lamb again smelled smoke. Upon opening the hallway door Peter Lamb was hit with a "gush" of smoke. He evacuated his family and then returned to advise other tenants that there was a fire. Within minutes, the fire department and police arrived after having been called by Cindy Lamb.

(f) After the fire in the Ortiz apartment had been extinguished, the Lambs, at about 11:30 P.M., were allowed to return to their apartment. They observed the smoke and water damage to their apartment and that the fire fighters had ripped out the baseboard along their living room wall. With the baseboard removed, the Lambs could see through the floor down into the burned closet in the Ortiz apartment. Around midnight, the

Lambs heard "voices" in the Ortiz apartment. They went to the place where the baseboard had been removed and overheard two people talking. The Lambs recognized the voices as those of Esther Ortiz and the defendant. Peter Lamb testified that he overheard the following conversation between the two:

PROSECUTOR: "And could you hear what the voices were saying?"

PETER LAMB: "I heard Esther speak up and say, 'Keith' — this is when I found out what his name was — 'what are we going to do?'

"Keith had replied, 'Don't worry about it. Keep your story straight. The next time it burns, it will burn right.'

"Then I heard Esther speak up and say, 'Make sure the people upstairs burn with it.' "

PROSECUTOR: "And —"

PETER LAMB: "I heard Keith speak up and say, 'Let's get the hell out of here.' "[1]

The defendant and Esther Ortiz were subsequently seen leaving the apartment.

1. The judge properly denied the defendant's motion for a required finding of not guilty at the conclusion of the Commonwealth's case. Proof of arson is usually based on circumstantial evidence. Whether the jury could find, in this case, that the defendant committed the arson, or assisted in its commission as a joint venturer, depended upon the inferences that could reasonably be drawn from all the evidence. "It is not required that the inferences be unescapable or necessary; it is enough if they are not too remote according to the usual course of

---

[1] Cindy Lamb testified that she overheard the following part of the same conversation between Ortiz and the defendant.

PROSECUTOR: "And who did you hear speak first?"
CINDY LAMB: "Esther Ortiz."
PROSECUTOR: "And what did Esther say?"
CINDY LAMB: " 'Keith, I'm scared. What are we going to do?' "
PROSECUTOR: "Did you hear someone reply?"
CINDY LAMB: "Yes."
PROSECUTOR: "Who was that?"
CINDY LAMB: "Keith."
PROSECUTOR: "And what did he say?"
CINDY LAMB: " 'Don't worry about it. Just keep your story straight. The next time it burns, it will burn up right.' "

events, and if all the circumstances including inferences are of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of incendiarism beyond a reasonable doubt." *Commonwealth* v. *Cooper*, 264 Mass. 368, 373 (1928). See also *Commonwealth* v. *Lanoue,* 392 Mass. 583, 589-590 (1984); *Commonwealth* v. *DeStefano*, 16 Mass. App. Ct. 208, 215-216 (1983).

Here, elaborate arrangements had been made in the Ortiz apartment in order to start a fire. The oven and gas stove burners had been turned on, the doors locked, the windows closed, and a fire started in the bedroom closet. The hidden location of the fire indicates an intent to prevent its detection long enough to allow the arsonist to escape from the area. See *Commonwealth* v. *Jacobson*, 19 Mass. App. Ct. 666, 673 (1985). Further, when the gas reached the flames it would have caused an explosion which could have also damaged the Lambs' apartment. The defendant was seen entering the building alone at the approximate time the fire had been set. He was familiar with the interior of the apartment. Also, he was on friendly terms with Esther Ortiz, who had made repeated threats to burn down the building and strongly disliked the Lambs. It could be inferred from the evidence that the defendant was aware of the feud between the two families. Finally, the conversation between Esther Ortiz and the defendant in the Ortiz apartment soon after the fire had been extinguished permitted an inference that they had jointly participated in the arson.

Under the governing standard, see *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), the evidence allowed the jury to find that the defendant either actively assisted in or was the actual perpetrator of the arson. Although no one piece of evidence alone was enough, considered in combination the circumstances formed a fabric of proof sufficient to warrant the jury's verdict beyond a reasonable doubt. *Commonwealth* v. *Shuman*, 17 Mass. App. Ct. 441, 447 (1984). We reject the defendant's arguments that the question of his guilt was left to conjecture or surmise. Specifically, we reject his argument that the Commonwealth's evidence showed only that he

may have assisted Ortiz in concealing the arson; a role consistent with the crime of an accessory after the fact for which he was not charged.[2]

2. The defendant also contends that there was no adequate perceptual basis for either of the Lambs to claim that they recognized the male speaker's voice in the conversation with Ortiz. See *Commonwealth* v. *Cappellano*, 392 Mass. 676, 679 (1984). As such, the defendant argues that admission of the Lambs' testimony about the overheard conversation was error and without that testimony the Commonwealth cannot meet its burden of proof. We disagree.

In the discretion of a trial judge, a voice identification may be considered by a jury as long as the witness expresses some basic familiarity with the voice he or she claims to identify. See *Commonwealth* v. *Williams*, 8 Mass. App. Ct. 283, 290-291 (1979); Proposed Mass.R.Evid. 901 (b) (5) (1985) ("[i]dentification of a voice, whether heard first hand or through mechanical or electronic transmission or recording" may be made "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker"). See also *United States* v. *Rizzo*, 492 F.2d 443, 448 (2d Cir. 1974).

The Lambs testified that they had recognized the defendant's voice, and they described the prior occasions when they had heard him speak.[3] The fact that the Lambs did not either point out any particular characteristics of the defendant's voice, or demonstrate more intimate familiarity with his voice, did not require exclusion of their testimony. The jury could give the Lambs' testimony as much or as little weight as they saw fit.

---

[2] The Commonwealth's case did not deteriorate during the presentation of the defendant's evidence. Therefore, we need not consider separately the defendant's renewed motions for required findings of not guilty made at the close of all the evidence and after the return of the jury's verdict. *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 n.1 (1976). *Commonwealth* v. *Griffin*, 19 Mass. App. Ct. 174, 178-179 n.2 (1985).

[3] Peter Lamb testified that he had spoken with the defendant (and heard him speak) in the Ortiz apartment shortly after the fire and before he overheard the conversation. Cindy Lamb testified that she had heard the defendant speak two or three times to Esther Ortiz's husband when Cindy was visiting at the Oritz apartment.

See *Commonwealth* v. *Cappellano*, 392 Mass. 676, 679 (1984). See also *Mielke* v. *Dobrydnio*, 244 Mass. 89, 92 (1923). The judge did not abuse his discretion in admitting the Lambs' testimony.

3. The defendant challenges the judge's instructions on the malice element of arson. That portion of the judge's instructions which is called into question is set forth in the margin.[4] The defendant points out that the judge equated malice with unlawful conduct. This, he maintains, is at odds with *Commonwealth* v. *Niziolek*, 380 Mass. 513 (1980). In *Niziolek*, it was said (at 527) that a "sufficient" instruction on the malice requirement in arson could involve "the language of *Commonwealth* v. *York*, 9 Met. 93, 104 (1845), that malice 'characterizes all acts done with an evil disposition, a wrong and unlawful motive or purpose; the wilful doing of an injurious act without lawful excuse.'" See also *Commonwealth* v. *Goodwin*, 122 Mass. 19, 35 (1877). Moreover, the defendant's trial counsel did not object to the instructions on the elements of arson. Thus, we inquire only whether there was anything said or omitted that could have created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 (1986).

The *Niziolek* instruction simply emphasizes the fact that arson encompasses the usual concept of malice, that is, the wilful commission of an unlawful act. Excluded from that concept are acts that are lawful or the result of an accident or mistake. Arson is not one of those crimes involving malice which require a showing that the defendant acted with cruelty,

---

[4] "In order to prove that defendant willfully and maliciously set fire to a dwelling house, you'd have to — the essential elements of that, the essential elements that the Commonwealth would have to prove is number 1, that the defendant set fire to — that doesn't mean burn down — it meant set a fire that damaged; and 2, that it was a dwelling house, a house that was used or designed to be used as a dwelling or domicile, where people live in the house. They had to prove that the fire was set; that the fire that was set was intentionally and maliciously, which means unlawfully set; that the fire caused damage to be done to a dwelling house. All of those are the essential elements of the crime. And the Commonwealth making that allegation against the person has the burden of persuading you beyond a reasonable doubt that all of those elements were present."

hostility, or revenge towards the person whose property is damaged.[5]

The instructions on malice in this case would have been improved by use of the formulation recommended in *Niziolek*. The judge did emphasize, however, that to convict, the jury had to find that the fire had been set deliberately and unlawfully.[6] At trial, there was no serious dispute that the arrangement of the open gas jets and the materials burning in the closet was purposeful and intended to cause substantial destruction to the building. In fact, no issue of accident or mistake was presented. Thus, it was not an active issue at trial whether the arsonists acted with the requisite malice. Rather, the defense was predicated on the theory that someone else had turned on the gas jets and had set the fire, and that the defendant had been misidentified at the scene by the Lambs. The defendant (and Esther Ortiz) produced testimony in support of their mistaken identity theory at trial. The judge instructed the jury carefully on the evaluation of identification testimony.[7] In light of these considerations, and the decisions which refuse a new trial when a defendant's trial counsel pursues a particular trial strategy and fails to object to possible errors in jury instructions, see *Commonwealth* v. *Lee*, 383 Mass. 507, 511-512 (1981); *Commonwealth* v. *Festa*, 388 Mass. 513, 515 (1983), we discern no substantial risk of a miscarriage of justice.[8]

---

[5] This is the point of the reference to the *Goodwin* decision in *Niziolek*. As a careful reading of the quoted language in *Niziolek* (with attention to the semicolon) discloses, the "evil disposition" required to establish malice in arson equates with the wilful commission of an injurious act without lawful justification or excuse. See also *Commonwealth* v. *Lamothe*, 343 Mass. 417, 419 (1961), quoting from *State* v. *Pisano*, 107 Conn. 630, 632 (1928): "The malice which is a necessary element in the crime of arson need not be express, but may be implied; it need not take the form of malevolence or ill will, but it is sufficient if one deliberately and without justification or excuse sets out to burn the dwelling house of another."

[6] By contrast, in *Niziolek* the trial judge failed to provide the jury with any definition of the element of malice which is necessary to convict of arson.

[7] The instructions on this issue followed the outline recommended in *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 310-311 (1979).

[8] We agree with the Commonwealth that no substantial risk of a miscarriage of justice was created by the judge's instructions on joint venture, which also were not objected to. The joint venture instructions were essen-

4. After presenting two witnesses, the defendant's trial counsel rested his case. The codefendant, Esther Ortiz, then testified in her own behalf. Prior to her testimony, the judge, without objection, gave limiting instruction that the testimony of Ortiz was not to be considered in the jury's consideration of the defendant's guilt. The direct examination of Ortiz contained nothing harmful to the defendant. She stated in cross-examination that the defendant had been a friend of her husband and had been to her apartment a few times. At the conclusion of her direct testimony, the defendant's trial counsel asked to cross-examine Ortiz. The judge denied the request. The defendant's trial counsel neither indicated what he wished to question Ortiz about, nor sought to reopen the defendant's case to include her testimony.

It is now alleged that the defendant was denied his constitutional right to cross-examine an adverse witness. It is also urged that the prosecutor misused the testimony by arguing in his summation that the defendant's friendship with Esther Ortiz led him to help her in commission of the arson.

The contentions lack merit. By two specific instructions the judge carefully excluded from the jury's consideration in the defendant's case any testimony given by Ortiz. See *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 313-315 (1971). Her testimony, on the whole, favored the defendant's position in the case. Having made a conscious choice to rest his case, and having acquiesced in the judge's limiting instructions, the defendant could not have it both ways. He could not seek to elicit testimony from Ortiz which might support his case while, at the same time, asking that any unfavorable testimony be excluded from the jury's consideration. Moreover, the prose-

---

tially complete and accurate. Read in context, the now-criticized reference to "aiding in the escape or fleeing from the scene" was addressing the situation where a defendant may be held liable (as a joint venturer) when he acts as a lookout or agrees in advance to assist in the principal felon's escape. *Commonwealth* v. *Giang*, 402 Mass. 604, 608 (1988). The instructions did not create the likelihood of the defendant's conviction as an accessory after the fact. Nor did the instructions create a risk that the jury would convict without finding that the defendant had participated in the commission of the crime.

cutor's references in his closing to the defendant's prior contacts with the Ortiz family had a basis in the testimony heard before Ortiz took the stand. No constitutional right of confrontation was abridged. Further, nothing else occurred in this aspect of the case which created a substantial risk of a miscarriage of justice.

*Judgment affirmed.*